[Civ. No. 2524. First Appellate District.—November 21, 1918.]

## A. J. SHIELDS, Respondent, v. RANCHO BUENA VENTURA (a Corporation), Appellant.

Contract—Action for Services—Compensation Contingent on Profits—Failure to Render Account.—In this action by a ranch manager to recover for labor and services, and for money due for advances and interest, where the contract required the plaintiff to keep proper books of account and to render an account annually, and provided for the payment of all the expenses of operation before the payment of any compensation to the plaintiff, a judgment for plaintiff, without proof of the rendering of any account in accordance with the contract, was without evidence to support it.

APPEAL from a judgment of the Superior Court of Fresno County. H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

Short & Sutherland and Carl E. Lindsay, for Appellant.

Frank Kauke and George Cosgrave, for Respondent.

LENNON, P. J.—Plaintiff brought this action to recover the sum of $7,988.48, alleged to be due him for labor and services and for money advanced, with some added interest. Four counts were set out in the complaint, the first being for services for which, with interest, the sum of $4,320.34 was claimed, and the second for the sum of $3,217.66 for money had and received. The aggregate of these two sums forms the total demand. The third count sets out a cause of action for the same aggregate amount based upon allegations that the

plaintiff and defendant entered into a written contract, by which the plaintiff was employed to manage a large ranch owned by the defendant, and that while so employed there became due to him from the defendant a sum in excess of four thousand dollars as compensation for his services; that this sum was not paid to him, but that he allowed it to be retained by the defendant and invested in the business of the ranch, together with additional sums advanced by him, making up the aggregate of the first and second counts; and the fourth count represents the whole sum demanded as having been loaned to the defendant upon a promise to repay it with interest.

The cause was tried by a jury, and resulted in a verdict for the sum of $7,069.94. It is difficult to determine from the record just how this precise sum is arrived at, but respondent has assisted us in solving this problem, and states in his brief that it is made up as follows: "His [plaintiff's] salary at the rate of one thousand five hundred dollars per annum, computed from January 1, 1910, to October, 1912, amounted to $4,250, and the money advanced and not repaid amounted to three thousand dollars additional, which with some other small items of account added, left a balance after sundry credits of $7,069.94."

Judgment was entered in favor of plaintiff for this amount, and defendant appeals. The record discloses no motion for a new trial; and in support of the appeal the only point made is that the verdict and judgment are without any support whatever in the evidence, and defendant asks that the judgment be reversed and that the trial court be ordered to enter judgment in its favor.

The record shows that the defendant was the owner of a stock ranch consisting of between two thousand and three thousand acres in Shasta County, known as the Rancho Buena Ventura, the operation of which constituted the sole business of the corporation. The entire capital stock of the company, outside of one or two qualifying shares, was owned by Frank H. Short, who was president of the corporation, A. J. Shields, the plaintiff—who was also its vice-president—and one Hoxie. Shields, at the time this controversy arose, owned a little more than one-fourth of this capital stock, and of the remainder Short was the owner of the major part. For several years the ranch was managed by the plaintiff, the proceeds being devoted to its operating expenses, its further improvement,

and in payment of the services of the plaintiff. In its undeveloped state the proceeds were insufficient to meet these expenses, and the deficit was contributed by these three stockholders, and additional capital stock issued to each in proportion to such contribution. Finally, this course of procedure not proving satisfactory, an agreement was entered into between the corporation and the plaintiff, by which the latter undertook to manage and operate the ranch at his own expense, with a contingent arrangement for his compensation. The condition of affairs which led to entering into this agreement is referred to in a letter written by Mr. Short to the plaintiff, in which he says: "When you were down some months ago I mentioned that I thought it would be more satisfactory to all of us for it to be arranged that you should handle the ranch and personal property on some sort of annual leasing arrangement, in which we would be protected against taxes or expenses and possibly allowed some small return on the investment, and I thought with the ranch in its better developed state and with quite an acreage of producing alfalfa you ought to be able to handle it and make something out of it for yourself and keep us at least free from expenses." This contract, while actually entered into on April 15, 1910, was to govern the relations of the parties from January 1st of the same year. The part of this agreement material to the questions here involved is as follows:

"Whereas the party of the second part [plaintiff] for several years past, as the representative of the party of the first part, has been in charge of the ranch and property of the first part near Cottonwood, Shasta county, California, and whereas it is desired to enter into a definite arrangement with regard to the operation, use and management of said property, being said ranch and the improvements, stock and personal property thereon,

"Now therefore, this agreement witnesseth that the party of the second part agrees to take charge and management of said property on his own account and at his own expense, and from the date hereof to conduct and manage said property upon his own credit, account and expense, upon the following terms and conditions, to wit,

"The said party of the second part is to have charge and use of said ranch, together with the improvements and crops growing thereon, together with the horses, cattle, farming

utensils and personal property thereon or used or connected therewith, and will manage and conduct said ranch in a thoroughly good and farmerlike manner, and take proper care of the trees, vines, alfalfa, and other crops growing thereon, and in proper season and in a good and farmerlike manner plant, cultivate, farm and look after said ranch and pasture or dispose of the pasture lands thereon for as good rental as can be obtained therefor . . . and in like manner carefully look after, care for and feed all of the stock upon the said premises and the increase thereof, and manage and care for all of the same in the best manner and to the best advantage possible, and harvest and dispose of all crops grown on said premises.

"The party of the second part is to keep full and correct books of account, showing all receipts and expenditures by him received, incurred or made in connection with said ranch, all business and the products thereof, and all of the same, and on the first day of January of each year the party of the second part will render a complete, full and correct statement of his accounts and transactions, receipts and expenditures as aforesaid, and shall pay and discharge at his own account and expense all of the expenses of conducting, farming and managing said ranch and property, and everything done or to be done under or in accordance with the terms of this lease, and will pay all taxes . . . ; and the proceeds of said ranch shall be first applied upon and in or toward the satisfaction thereof, and after all of said charges and expenses are first paid, the second party shall have and receive for his use and benefit and as full compensation for his services, fifteen hundred dollars for each year, or a like amount for the fractional portion of any year during which he shall remain in possession and charge of said premises, and all of the rest, residue and remainder of said proceeds of said ranch in excess of the expenses thereof as aforesaid shall be paid over on or before the first day of January of each year by the party of the second part to the party of the first part. ·

"It is the understanding and intention that the household and living expenses of the second party and his family shall, as heretofore, be considered a part of the expenses of running and maintaining said ranch, and shall be charged and paid for out of the proceeds thereof as heretofore, but not otherwise; and it is the understanding and intention that in the event of

a sale of said premises and property, or any substantial part of said real property by the party of the first part, that this agreement shall immediately cease and determine and be at an end, and the party of the second part shall be entitled to if necessary remain in possession of said premises so that he can receive the credits and income thereof for the year during which said sale occurs, or else the party of the second part shall be entitled to receive and shall receive fair and just compensation and allowance for expenses incurred in connection with the planting, care and cultivation of any crop or crops that have not been by him harvested and disposed of, so that upon such termination of said lease all rights and interests of the respective parties hereto shall be equitably and fairly settled.''

The contract also contained a provision by which either party could terminate it by giving thirty days' notice preceding the first day of January of any year, and if not sooner terminated, its duration was to be five years from January 1, 1910.

The plaintiff, by virtue of this contract, continued in the management and operation of the ranch until about the end of October, 1912, when the entire ranch and all personal property upon it, including farming implements, hay, and stock, were sold for the sum of one hundred and fifteen thousand dollars. In the meantime, the annual account required by the contract had not been rendered in spite of frequent and urgent requests on the part of the company's president, and it was not until November, 1914, more than two years after the sale took place, that the plaintiff rendered an account. We set the account out in full. It is as follows:

''Rancho Buena Ventura.

''Receipts.

From January 1st, 1910, to Oct. 31st, 1912.

| | | |
|---|---|---:|
| Sale of hay | | $ 8,402.63 |
| '' | pasture | 1,665.62 |
| '' | live stock | 15,729.07 |
| '' | wagon | 40.00 |
| '' | produce | 1,465.78 |
| Inventory | | 11,850.00 |
| Cash on hand Oct. 31st, 1912 | | 397.72 |
| | | 39,550.82 |

"Disbursements.

From Jan. 1st, 1910, to Oct. 31st, 1912.

| | | |
|---|---|---|
| Paid for labor | | $ 7,731.41 |
| " | live stock | 12,915.18 |
| " | farm implements, etc. | 395.00 |
| " | general supplies | 8,061.68 |
| Gain | | 10,447.55 |

39,550.82"

There can be no doubt that the plaintiff was required by his contract to render an account annually; and it is apparent that without this annual account there was no basis upon which a settlement could be arrived at between the parties. The plaintiff's compensation of one thousand five hundred dollars per annum was contingent upon this amount being earned by the operation of the ranch during the year. There is nothing in this account nor elsewhere in the record to show what the proceeds of the farming operations were for the year 1910. The same is true for the year 1911. The fact that the single account rendered purports to show a gain for the entire period covered by the plaintiff's operations under the contract affords no inference that there were any net proceeds for the year 1910, nor for the year 1911, out of which the plaintiff's compensation for those years could be paid. It is quite possible that for the year 1910 there were no net proceeds. If so, the plaintiff was not entitled to any compensation. And, of course, the same is true of the following year. We do not mean to intimate that the net proceeds referred to in the contract means actual cash arising from sales of produce of the ranch. We think a proper construction of this contract, having in mind the conditions under which it was entered into and its objects and purposes, would treat as proceeds not only money received from actual sales of produce, but the increased value of stock or produce on hand at the end of a given year over the value of stock or produce on hand at the end of the preceding year; for it was the duty of the plaintiff, under his contract, to manage the business prudently and for the best interests of his employer, and it would not be to that interest that he should, in anticipation of the closing of the annual period, make hasty and ill-advised sales of produce merely for the purpose of having money on hand applicable

to the payment of expenses and his own compensation; but, as we have said, there is nothing in the record to show what was the result of the plaintiff's operations for any year covered by the contract. It is quite possible, and indeed probable, that the facts existed entitling the plaintiff to some payment for the years 1910 and 1911; but if so, the burden was upon him to show it. This was the view taken by the trial court. In its instructions to the jury the court advised that body that the plaintiff must recover, if at all, under and in accordance with the terms of the written agreement; that he was to present his accounts and settle annually with the defendant, and that the plaintiff was not entitled to any part of the compensation of one thousand five hundred dollars per annum unless during said year he had received and obtained an amount in excess of the expenses of operating and conducting the ranch. The court also instructed the jury, and correctly, that the operation by the plaintiff of the ranch was as to each year a separate and distinct transaction and not a continuous transaction for the entire period. The jury, in the condition of the evidence upon which the cause was submitted, had no means of knowing whether for the years 1910 and 1911 there was anything due from the defendant to the plaintiff under the terms of his contract. Its verdict, therefore, by which it awarded to him the sum of $125 per month for this period is against the evidence, and cannot stand.

The same conclusion must also be reached as to the amounts paid out by plaintiff for expenses of operation during these years, unless there was an unconditional promise on the part of the defendant to pay these—a question which we will consider later. The burden was upon the plaintiff to show specifically these payments and the facts upon which his right to reimbursement depended.

Coming now to the year 1912, the contract provided that in the event of a sale during any year, the contract should immediately terminate, and the plaintiff should be "entitled if necessary to remain in possession of said premises so that he can receive the credits and income thereof for the year during which said sale occurs, or else, the said party of the second part shall be entitled to receive and shall receive fair and just compensation and allowance for expenses incurred in connection with the planting, care and cultivation of any crop or crops that have not been harvested or disposed of, so that

upon such termination of such lease all rights and interests of the respective parties hereto shall be equitably and fairly settled.'' This clause of the contract, construed with relation to its object and purpose, required the parties to reach a settlement for the operations of the year 1912 upon an equitable basis. The record does not disclose that any effort to this end was made by the plaintiff, nor does it contain the facts upon which the court could arrive at an equitable adjustment. The plaintiff in his complaint treated this part of the period of his employment in the same way as the first two years, and asked to be allowed compensation at the same rate of $125 per month and to be reimbursed his expenses without regard to any equitable consideration, such as the profit accruing to the defendant as the result of his labors. This part of the plaintiff's case seems to be in much the same situation as that already considered: he neglected to place in evidence the facts upon which his right to recovery depended.

The respondent, however, contends that his consent to the sale of the ranch was only given upon the condition that certain sums, amounting to about three thousand dollars, claimed to have been paid out by him in the purchase of cattle for stocking the ranch, and, therefore, coming within the designation of expenses of conducting and operating it, should be paid to him. The evidence upon this point is that an offer of one hundred and fifteen thousand dollars (the sum for which it was ultimately sold) had been made for the ranch, including the whole amount of personal property used in connection with it and the livestock. This offer was at variance with that made by the company, which did not include certain livestock; and upon its receipt the president of the corporation sent the following telegram to the plaintiff: ''Moore is ready to close, but understood all personal property was included and went with ranch. I had supposed he had your list and understood that part of property only went with sale, but as he is ready to close and sale will be net to us, and others may fall down as heretofore, I prefer to close including all personal property. Either telegraph approval or come down without fail. Lease to be canceled but Moore wants to arrange for you to continue on ranch. Answer quick.'' To this telegram the plaintiff replied as follows: ''Gave Avus typewritten list of all personal property ever offered for sale with ranch when he asked for an inventory of all personal property on ranch

which I gave him, which I wrote you. The difference between the first and second inventory means about four thousand dollars to me personally and must be protected. That being understood, approve sale.'' Mr. Short, the president, replied to this telegram, asking what the plaintiff meant by the expression ''to me personally,'' to which the plaintiff sent the following reply: ''Four thousand dollars represents about what it will take for labor, taxes and a balance on some cattle I bought. This explains to you what personally to me means. Am in favor of sale.'' The sale was thereupon closed at the figure of one hundred and fifteen thousand dollars for the entire property.

The contention of the plaintiff is that this exchange of telegrams followed by the sale constituted an undertaking by the defendant to reimburse to the plaintiff an amount approximating four thousand dollars, including a sum undetermined which the latter had paid out for cattle which were included in the sale of the ranch. It is quite evident that the object which the plaintiff had in view in reserving part of the livestock from the sale was that it might be sold separately, and a fund thus created which would be in his control and which he could apply to the payment of expenses incurred by him, including the purchase of cattle, in the operation of the ranch. But such reimbursement could only be made in accordance with the terms of the contract; and to this reimbursement according to those terms the plaintiff was entitled irrespective of whether the funds for that specific purpose passed through his hands or not. Whether the reserved livestock was sold separately or as a part of the entire ranch, they were still ''proceeds'' applicable to the payment of his demands. The value of this livestock was readily ascertainable; and its amount, deducted from the one hundred and fifteen thousand dollars, was proceeds from the operation of the ranch out of which the plaintiff's expenses and outlays were payable, the balance of the one hundred and fifteen thousand dollars representing the price of the ranch itself. We may further observe as to this matter—without desiring to place much emphasis on what follows—first, that it is by no means clear that the consent of the plaintiff was necessary to effect the sale upon the terms proposed; second, that although the first telegram of the plaintiff above set out gives his consent to the sale conditionally, the second telegram ends with the words, ''Am in

favor of sale,'' without referring to the condition; and, third, testifying as to what these outlays were for which he was desirous of reserving the livestock in question from the sale he stated, ''It was what I was personally responsible for anyhow, that I had given my collateral and so forth for when I bought the ranch. I owed those bills, and I was trying to provide a way, and I told you distinctly that if that was gone [referring to this livestock] then I had nothing to pay with. . . . '' But it appeared elsewhere in the testimony that capital stock in the company had been issued to the plaintiff for all claims existing up to January 1, 1910, a time long subsequent to the purchase of the ranch; and if the plaintiff was still indebted to the persons from whom he bought this livestock for its price, that was no concern of the defendant, and the plaintiff would not have been entitled to pay this debt from the proceeds of the defendant's property. However, we think it better to place our decision as to this point upon the broad ground that the inclusion in the final sale of the livestock in question did not deprive the plaintiff of any rights which he possessed against the defendant. The livestock was the property of the defendant although the money for its purchase might have been advanced by the plaintiff; and at the trial of this case it was not contended otherwise.

Considerable emphasis is laid by the respondent upon what he terms the lack of equity shown by the defendant in resisting his claim. A perusal of the record will show, however, that the plaintiff, if he had produced the evidence which was probably at his disposal, had no need to resort to any considerations of equity for a recovery, but could have stood upon his strict legal rights; and it will show that the equities were not all on his side, for the president of the company, Mr. Frank H. Short, for years attended to the business, financial and legal affairs of the corporation, including the time covered by the contract here under consideration, and was himself instrumental in procuring the sale of the ranch, all of which he did without any compensation whatever from the defendant. The record also shows that from the time when the first account of the plaintiff was due to the time it was actually rendered by him—a period of nearly three years—the president of the company continually urged upon the plaintiff the necessity of rendering his accounts. He neglected to do this without any excuse other than that he was busy with the affairs of

the ranch.    An ordinary compliance with simple business pro-
·cedure, under a contract' the terms of which are extremely
simple and unambiguous, would have avoided all the trouble
of this litigation, not only to himself but to others, who were
in no way responsible for the plaintiff's delay and neglect.

We think it clear from the foregoing that as to none of the
various amounts making up the verdict of the jury was there
any evidence upon which it could be based.    The judgment is,
therefore, reversed.

Sturtevant, J., *pro tem.*, and Beasley, J., *pro tem.*, con-
curred.

A petition to have the cause heard in the supreme court,
after judgment in the district court of appeal, was denied by
the supreme court on January 20, 1919.

All the Justices concurred.